# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-4329

PAUL KNOX,

*Plaintiff-Appellee*,

v.

DEBORAH SMITH,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 4825—**Milton I. Shadur**, *Judge.*

———————

ARGUED JUNE 6, 2003—AUGUST 26, 2003

———————

Before RIPPLE, KANNE, and DIANE P. WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* During the spring of 1999, Paul Knox was arrested twice, once in April and once in May, for violating the terms of his mandatory supervised release (MSR) agreement with the Illinois Prisoner Review Board. Knox filed this suit against his parole officer, Deborah Smith,[1] under 42 U.S.C. § 1983, alleging that both arrests violated his constitutional right to be free from unreason-

———————

[1] The lawsuit named several other defendants, including numerous state officials, but only Deborah Smith remains in the suit; the others either having been granted summary judgment or having been dropped from the suit by Knox.

able seizures. Smith moved for summary judgment on both claims on grounds of qualified immunity. The district court granted Smith's summary judgment on the claim arising from the April arrest, but not on the claim arising from the May arrest. Smith appeals the denial of summary judgment on the May claim and we reverse.

## I. History

Paul Knox has spent much of the last twenty years in and out of the Illinois prison system for offenses including attempted murder, rape, and armed robbery. In March 1999, he was serving a one-year sentence for drug possession, when arrangements were made to place him on MSR. As part of his MSR, Knox was required to have electronic home monitoring and intensive supervision, so he was placed under the supervision of the Cook County Special Intensive Supervision Unit, which monitors electronic-detention residents.

According to the March arrangements, Knox would be on electronic home detention and would reside at a "host site" with his brother, Milan, who agreed to allow Knox to live on one side of his duplex. Milan also agreed to have a separate phone line installed for electronic home monitoring of Knox by Automated Management Systems (AMS), a service provider that monitors, records, and documents a parolee's activities and pages parole agents about problems with parolees.[2]

---

[2] Electronic home detention requires that a parolee remain within the property boundaries of the host site during the times specified. Typically, a parolee's whereabouts are monitored by attaching an ankle bracelet to the parolee's leg and installing a monitoring box on the parolee's telephone. The monitoring box sends out periodic electronic beams that will detect if the ankle bracelet is
(continued...)

Before he was initially released, Knox signed an MSR agreement with the Illinois Prisoner Review Board, which required him, among other things, to comply with the instructions of his parole officer, including any instructions to submit to electronic home monitoring. Knox was also given a copy of the Electronic Home Detention Rules, but, in an apparent attempt to avoid home detention, he refused to sign them. He also received an Illinois Sex Offender Registration Act Notification Form, which stated that based on his earlier rape conviction, he must register as a sex offender. He did not sign this form either. Finally, Knox signed reporting instructions, which required him to go directly to his host site upon release and call AMS when he arrived.

Knox was released on April 2 and problems soon ensued. Deborah Smith, the parole officer assigned to Knox, was paged by AMS on April 2 after Knox had not called to report in and repeated phone calls to Knox's host site had gone unanswered.[3] When Smith went to the host site to check the problem, she found Knox and Milan arguing about Knox living there, and she discovered that the portion of the duplex in which Knox would be living did not have a telephone.

---

[2] (...continued)
on the premises. If the parolee is not on the premises (or if the parolee attempts to remove the bracelet) a signal is sent to the monitoring box on the telephone and a call is placed to AMS documenting the parolee's absence.

[3] When a parolee on electronic home detention has been released but monitoring equipment has not yet been installed at his host site, an AMS operator makes random voice verification calls to ensure that the releasee has not absconded. It appears that during all times relevant to this appeal, since Knox did not have his own phone line, these voice verification calls were made to a telephone in the portion of the duplex occupied by Milan and Knox's mother.

Because Knox did not have access to a telephone and Milan would not permit Knox to use his phone, Smith instructed Knox to call AMS every two hours from a nearby pay phone using a toll-free number until something else could be worked out. She also told Knox that, except when making calls to AMS, he was to stay at home until electronic monitoring equipment could be installed. Smith also instructed Knox that he had to register as a sex offender. Smith later called AMS to report the situation at Knox's host site and to document the instructions she had given him.

The next day Knox failed to call in and several verification calls made by AMS went unanswered. AMS paged Smith and informed her of Knox's apparent absence and failure to report. Based on these failures and the fact that Knox had not registered as a sex offender, Smith requested her supervisor to issue a warrant for Knox's arrest.[4] Within minutes a warrant was issued for Knox as "AWOL" (absent without leave). The warrant was executed on April 9, and Knox was returned to custody. On April 23, a violation report, signed by Smith, was submitted to the Prisoner Review Board. The Prisoner Review Board held a hearing on May 11 and determined that Knox had violated his MSR. Nonetheless, the Board ordered that he be re-released by May 30.

Following the hearing, arrangements were again made to place Knox on MSR under the same terms as before. On May 26, he signed another MSR agreement, and he signed reporting instructions similar to those he had previously received. Also, as before, he was required to submit to elec-

---

[4] Smith's supervisor, Melvin Walker, had the task of enforcing MSR agreements. He had the authority to issue a warrant for any violation of an MSR, and he had to approve any arrest warrant requested by Smith.

tronic home monitoring as a condition of his MSR. He was given a copy of the Electronic Home Monitoring Rules, which he again refused to sign. This time, however, the rules sheet was signed by two witnesses, who certified that Knox was placed on parole with home detention as a condition and that in light of his refusal to sign the instructions, the rules were explained to and, to the best of the witnesses' knowledge, understood by Knox. Deborah Smith was once again assigned to be Knox's parole agent.

Knox was re-released on May 28, and after arriving at his host site, again his brother's duplex, Knox called AMS around 10:45 p.m. to report his arrival. According to Knox's amended complaint, during this call he was told to stay at home until the electronic monitoring equipment had been installed and an ankle bracelet had been placed on him. AMS made several verification calls later that night, again to the phone in Milan's portion of the duplex, all of which went unanswered.

At about 7:00 a.m., May 29, a technician arrived at the duplex to install the electronic monitoring equipment. The technician, however, was turned away by Knox's mother, who informed him that Knox did not live in that part of the duplex and did not have access to the telephone. The technician called AMS to report the problem.

Smith testified in a deposition that she visited Knox's host site on May 29 but Knox was not there. She claims that Milan informed her that Knox was at his girlfriend's house, so Smith drove there, picked Knox up, and returned him to the host site. Once there, Smith claims that she explained to Knox that he would have to be placed on electronic monitoring equipment, and that until the equipment could be installed, or until an alternative host site could be found, he was to remain in his house and call AMS every two hours, just as he had been instructed to do in April. Once again Milan objected to the installation of the moni-

toring equipment. In his deposition, Knox gave rather con-
fused testimony about whether Smith visited and what she
instructed him to do, testifying at one point in accord with
Smith's account—that she had visited and had informed
him to call AMS every two hours—but at another point
testifying that he was instructed by someone to check-in by
reporting to the parole office in person once a week. Near
the end of his deposition, however, Knox again testified that
Smith had indeed visited him on May 29 and given him
instructions to call every two hours. The AMS report for
May 29 shows no record of Smith's alleged visit or her
instructions to call in every two hours. Smith testified at
various points in her deposition that it was her practice to
report any contact with releasees to AMS.

The AMS records, however, do show that several verifica-
tion calls were made to the duplex in the morning and early
afternoon of May 29. At 8:54 a.m., an AMS verification call
was answered by an unidentified man (presumably Knox's
brother) who rudely stated that he did not want to be called
and that Knox was next door. About an hour later, AMS
made another call that was answered by an unidentified
man who stated that Knox was at the other side of the
house and that AMS had called the wrong number. AMS
called the host site again at 11:53 a.m. The man who an-
swered stated that Knox was in another part of the house
and that AMS should call back in five minutes. AMS called
back a little more than an hour later at 1:00 p.m. This time
the man who answered the phone rudely informed AMS
that he did not know where Knox was. AMS immediately
paged Smith with the information, and at 1:15 p.m. she re-
sponded by paging her supervisor with a request for a war-
rant for AWOL. At 2:08 p.m. Smith's supervisor informed
AMS that a warrant would be issued for AWOL.

The next day Smith and her supervisor signed a violation
report, which chronicled Smith's version of the events of the
last two days: that she had gone to the host site and wit-

nessed Knox and his brother arguing, that she had instructed Knox to stay at home and call in every two hours using the nearby pay phone, that he had failed to call in, and that he had absconded.

The warrant was executed on June 22, 1999, and Knox was returned to custody. Knox had a hearing before the Prisoner Review Board, and on August 3, the Board determined that Knox had not violated his parole and that he should find a residence that would allow him to keep in close contact with his parole agent.

Knox filed this § 1983 suit in August 2000, alleging that Smith had violated his right to be free from unreasonable seizures under the Fourth Amendment, as applicable to the states through the Fourteenth Amendment. According to Knox, he had not violated the terms of his MSR agreement in either April or May, and both warrants were based on false information provided knowingly or recklessly by Smith. Smith asserted a qualified immunity defense and moved for summary judgment on both claims.

The district court granted Smith's motion on the April claim, but refused to grant summary judgment for the May claim, finding that there were genuine issues of material fact raised regarding whether the May 29 meeting between Smith and Knox occurred. While recognizing that Smith testified and Knox "seemingly confirmed" that she visited him on May 29 and instructed him to call in every two hours, the court observed that the May 29 AMS records, in contrast to AMS records from Smith's April visit, did not report that any meeting occurred between Smith and Knox or that she instructed him to call AMS every two hours. The court found that the absence of an AMS record suggested that Smith's testimony was not to be credited. And since the violation report stated that a warrant was issued based on Knox's failure to call in as instructed, the district court concluded that a jury could reasonably find that Smith

either knowingly lied or recklessly disregarded the truth in requesting the May warrant. Further the district court concluded that Smith was not entitled to qualified immunity because it was clearly established that to request a warrant based on evidence known to be false or recklessly inaccurate would violate Knox's constitutional rights.

## II.  Analysis

Smith asks us to reverse the district court's denial of summary judgment on qualified immunity grounds on the May claim. She argues primarily that even if we assume that she never met with Knox or gave him any instructions on May 29, that there was still no constitutional violation because she was justified in requesting a warrant based on her reasonable conclusion from the May 29 AMS reports that Knox had absconded in violation of his MSR.

We review a district court's ruling on summary judgment *de novo. Dykema v. Skoumal*, 261 F.3d 701, 704 (7th Cir. 2001). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact that must be decided by a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-55 (1986).

## A.  Jurisdiction

Knox first argues that we lack jurisdiction to hear this appeal because it is interlocutory. Typically, we have jurisdiction only to hear appeals from "final decisions" of district courts. 28 U.S.C. § 1291. In *Mitchell v. Forsyth*, however, the Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." 472 U.S. 511, 530 (1985). In other

words, we have jurisdiction over an appeal when the issue is simply whether, construing the disputed facts in the light most favorable to the plaintiff, the defendant violated any of the plaintiff's clearly established constitutional rights.[5] *See Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999) (citing *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998)).

Smith's claim is that she is entitled to qualified immunity because, even accepting the plaintiff's version of the facts, there was no constitutional violation. Resolving Smith's claim involves the determination of whether Smith had sufficient cause to believe that Knox had violated the terms of his parole. As we recently stated, probable cause [and, by analogy, reasonable suspicion] is normally a mixed question of law and fact, but where, as here, one side concedes the other's facts as to what happened, it is a question of law. *See Smith v. Lamz*, 321 F.3d 680, 684 (7th Cir. 2003). Because the determination of Smith's entitlement to qualified immunity turns on a question of law, we have jurisdiction over this appeal. *See Mitchell*, 472 U.S. at 530.

## B. Qualified Immunity

---

[5] Knox argues that we lack jurisdiction because the Supreme Court has held that a defendant may not "appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial," *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). But as we have observed, the Court's later opinion in *Behrens v. Pelletier* makes clear that "while a defendant is not entitled to immediately appeal a district court's determination that a genuine factual dispute exists about a material matter, an interlocutory appeal may properly cover a defendant's assertion that a district court's ruling that a given set of facts shows a violation of 'clearly established' law is incorrect." *Coady*, 187 F.3d at 730 (*citing Behrens*, 516 U.S. 299, 313 (1996)).

The qualified immunity defense is designed to protect government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine the availability of qualified immunity in a particular case we must engage in a two-step inquiry. The initial, threshold question is whether the facts, taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a constitutional right is violated, then we must determine if that right was clearly established at the time of the alleged violation. *Finsel v. Cruppenink*, 326 F.3d 903, 906 (7th Cir. 2003).

Knox claims that Smith violated his Fourth Amendment right against unreasonable seizure. Before analyzing his specific claim, however, it is important first to define what rights Knox had under the Fourth Amendment. Generally, citizens enjoy the right not to be seized or arrested absent probable cause. Knox, however, was a parolee at the time of the May seizure. The Supreme Court has made clear that parolees have a more limited liberty interest than ordinary citizens. *See Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) ("Revocation [of parole] deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions."); *see also Faheem-El v. Klincar*, 841 F.2d 712, 720 (7th Cir. 1988) (en banc). Consequently, the seizure of a parolee requires something less than probable cause to be reasonable under the Fourth Amendment. *Cf. United States v. Knights*, 534 U.S. 112, 121 (2001) ("Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable.").

Significantly, in *Knights*, the Court determined that reasonable suspicion was sufficient to justify a search of a probationer's house, given the limited privacy interest of the probationer and the increased governmental interest in closely monitoring a person who is considered "more likely than the ordinary citizen to violate the law." *Id.* at 119-21 (quotation omitted). Applying these considerations to this case, we believe that Knox's Fourth Amendment rights were similarly limited as were those of the defendant in *Knights*. Accordingly, we find that a seizure of Knox based on only reasonable suspicion would satisfy the Fourth Amendment standard.

Therefore, we must determine whether the facts, taken in the light most favorable to Knox, show that Smith requested the warrant without reasonable suspicion to believe that Knox had violated his MSR. *Cf. Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 742 (7th Cir. 2003) (noting that where an arrest is made pursuant to a facially valid warrant, a plaintiff must show that reasonable officers would have known that the evidence relied upon to request the warrant did not establish probable cause, so that they should never have applied for warrants in the first place). Knox asserts that Smith did not have reasonable suspicion because she obtained the warrant knowingly or recklessly relying on false information. We have held in previous cases that a warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue. *See Beauchamp*, 320 F.3d at 742-43; *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985).

According to Knox, the basis of Smith's warrant request was that he failed to call in every two hours as she had allegedly instructed him to do during their meeting on May 29. Knox claims, however, that when the evidence is viewed

in the light most favorable to him, it could be reasonably inferred that Smith never visited him on May 29 and never gave him instructions to call in every two hours. Therefore, a jury could appropriately conclude that Smith either knowingly lied or recklessly disregarded the truth in requesting the warrant because she requested it based on his failure to follow an instruction that she never gave him.

The district court agreed with Knox. In reviewing the factual dispute between Knox and Smith over the events of May 29, the district court determined that the absence of an AMS report confirming that Smith visited and gave Knox call-in instructions on May 29 created a question of fact about whether Smith had lied about the visit and instructions and therefore requested the warrant on information she knew was false. The district court further found that there was no information other than Knox's failure to call in that would have given Smith sufficient cause to request a warrant.

We disagree. Even if we assume that the May 29 meeting never occurred, we find that other, undisputed evidence supported Smith's reasonable suspicion that Knox had violated his MSR by leaving his host site without authorization. In other words, the "false information" that Smith allegedly relied on in requesting the warrant was not required for the warrant to issue. *See Beauchamp*, 320 F.3d at 742.

There is no dispute that Knox was not authorized to leave his host site at the time Smith requested the warrant. He was on electronic home detention as a condition of his MSR, and he was notified of this condition before his release from custody. (Doc. 34, Ex. 11 at 54-55.) The Electronic Home Detention Rules given to him before his release explained this condition, and while he may have refused to sign these rules, two witnesses certified that Knox was informed of and understood that his release was con-

ditioned on his participation in home detention. (Doc. 32, Ex. N.) Smith testified at her deposition that Knox was placed on electronic home monitoring upon his release in May, and that it was a violation of his MSR to leave the host site.[6] (Doc. 34, Ex. 9 at 97.)

Even Knox testified at his deposition that he was told before being released from custody in May that he had to be on electronic home detention. (Doc. 34, Ex. 11 at 55 and 76.) Finally, Knox's amended complaint claims that when he arrived at his host site on May 28, after his release, he called AMS to check-in and was instructed to stay at the host site until the electronic home monitoring bracelet was placed on his ankle. (Doc. 7, at 6, ¶ 38.)

The AMS reports of calls made to Knox's brother's phone in the morning and early afternoon of May 29 create a reasonable suspicion that Knox had absconded in violation of the home detention condition and the instructions he testified that he was given. The three AMS verification calls made on the morning of May 29 were all answered by a man who stated that Knox was next door. Of particular note, in response to the call at 11:53 a.m., the man who answered the phone stated that Knox was in another part of the house and that AMS should call back in five minutes. When AMS called back at 1:00 p.m., however, the man stated that he did not know where Knox was.

An officer in Smith's position could have reasonably concluded upon receiving the AMS call reports that there was

---

[6] At an earlier point in her deposition, Smith testified that she did not think Knox was aware that he was to be on home detention when he was released from custody in May. (Doc. 34, Ex. 9 at 83-84.) Knox, however, never makes this contention, and in fact his own testimony and the Electronic Home Detention Rules (both discussed more fully in the text) lead to the conclusion that he was aware of the home detention condition.

reasonable suspicion to believe Knox had left his host site in violation of his MSR. As we recently noted, reasonable suspicion is "something less than probable cause but more than a hunch," which exists when there is some "objective manifestation" that a person is, or is about to be, engaged in prohibited activity. *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) (quotation omitted). The significantly different information that Smith received as to Knox's whereabouts from the morning calls (he's in the other side of the house) and the 1:00 p.m. call (I don't know where he is) was an objective manifestation that Knox was there in the morning but had left the home some time between 11:53 a.m and 1:00 p.m. And the AMS records reflect that Smith, upon receiving the information from the 1:00 p.m. call, almost immediately requested a warrant for Knox based on the fact that he was AWOL.

Because undisputed facts show (i) that electronic home detention was a condition of Knox's MSR, (ii) that he was instructed not to leave his host site until hooked up to the system, and (iii) that Smith received information from AMS that Knox's whereabouts were unknown, we find that Smith had reasonable suspicion to believe Knox was AWOL. Given this, she did not violate Knox's constitutional rights in requesting the May warrant and therefore is entitled to entitled to summary judgment. *Saucier*, 533 U.S. at 202 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). Our inquiry here is at an end.

### III. Conclusion

The decision of the district court denying summary judgment in favor of Smith is therefore REVERSED and the case is REMANDED with instructions to grant summary judgment in favor of Deborah Smith.

**A true Copy:**

      **Teste:**

                     _____

                     ***Clerk of the United States Court of***
                       ***Appeals for the Seventh Circuit***