# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 02-4118

CONNIE SULLIVAN and MARY BLANCO,

*Plaintiffs-Appellees,*

*v.*

ROBERT RAMIREZ,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 01 C 1371—**Joe Billy McDade**, *Chief Judge.*

_____

ARGUED OCTOBER 27, 2003—DECIDED MARCH 3, 2004

_____


Before RIPPLE, DIANE P. WOOD and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Connie Sullivan and Mary Blanco brought this action against their employer, the Illinois Department of Transportation ("IDOT"), and their supervisor, Robert Ramirez, Chief of the IDOT Bureau of Employee Services. Their complaint alleged violations of their rights under the First Amendment, *see* 42 U.S.C. § 1983, and violations of state law. The district court dismissed IDOT on the ground that the Eleventh Amendment barred the action against it. It granted Mr. Ramirez's motion for summary judgment on the state claims but denied summary

judgment based on qualified immunity with respect to the First Amendment claims. Mr. Ramirez appeals this last ruling. For the reasons set forth in the following opinion, we reverse the judgment of the district court.

# I

## BACKGROUND

### A.  Facts

Connie Sullivan and Mary Blanco work for the IDOT Bureau of Employee Services ("the Bureau"). Robert Ramirez is the chief of the Bureau. The Bureau has two sections, Support Services and Training and Education. Ms. Sullivan is a management technician in the Training and Education Section. At the time of the events giving rise to this appeal, her immediate supervisor was Sandy Ferega, who reported to Richard Cunningham, who reported to Mr. Ramirez. Ms. Blanco is a budget administrator in the Support Services Section. During the relevant time period, her immediate supervisor was Doug Cunningham,[1] who reported to Ken Coburn, who reported to Mr. Ramirez. Neither Ms. Sullivan nor Ms. Blanco had any timekeeping responsibilities for the Bureau.

In January 1999, an anonymous letter was directed to the Governor's chief of staff, claiming abuse of time by Richard Cunningham.[2] Neither Ms. Sullivan nor Ms. Blanco sent the

---

[1]  Doug Cunningham is the son of Richard Cunningham.

[2]  Abuse of time refers to chronic tardiness, early departures and long lunches. Bureau employees work from 8:00 a.m. to 4:30 p.m. or from 8:30 a.m. to 5:00 p.m.

letter or know who sent the letter.[3] The matter was referred to the Illinois State Police in March of 1999, and they opened an investigation. Prior to the arrival of the police investigators, Mr. Ramirez held two brief meetings, one for each section of the Bureau. At those meetings, Mr. Ramirez told employees about the investigation and instructed them to cooperate with the police. He also told employees that he was unhappy with the anonymous letter, that the Bureau had an official timekeeper and that no one else was to keep time. Mr. Ramirez announced that he would throw away any more anonymous letters.[4] Ms. Sullivan and Ms. Blanco each attended the meeting for their section.

The police later interviewed employees of the Bureau, including Ms. Sullivan and Ms. Blanco. During their interviews, Ms. Sullivan and Ms. Blanco alleged that time abuse was occurring. The police asked them for documentation of this time abuse, but they could not provide such proof. The police ultimately concluded that the allegations of time abuse against Richard Cunningham were unsubstantiated, but suggested implementing internal controls. Mr. Ramirez then implemented a sign-in sheet that did not include times and that not everyone signed.

After the police investigation, Ms. Sullivan and Ms. Blanco recorded co-workers' office time on state-issued calendars. Both kept their calendars in a desk drawer, or in

---

[3] At his deposition, Mr. Ramirez testified that he believed Ms. Sullivan, Ms. Blanco or one of their friends wrote the letter and that he told his supervisor of this belief. *See* R.45, Ramirez Dep. at 96.

[4] In 1997 or 1998, an anonymous letter had been sent to the Deputy Director of Finance and Administration at IDOT alleging abuse of time by Richard Cunningham, Ken Coburn and Mr. Ramirez.

a purse, bag or case that they carried to work. Ms. Sullivan made her notations during breaks, lunch or after work. Ms. Blanco made her notations mostly over her lunch hour away from the office. In her deposition, Ms. Sullivan testified that she kept time because she wanted to protect herself if she were accused of time abuse. She claimed that Mr. Ramirez unfairly had allowed some to take late lunches or to arrive late and that the police had implied that she should have documentation. Ms. Blanco testified that she kept time because she wanted to cover herself and because the state police told her that any information on time abuse only would have value if the times and dates were written down. Both Ms. Sullivan and Ms. Blanco reported co-workers' tardiness to their supervisors, Richard Cunningham and Doug Cunningham, respectively.

After Ms. Sullivan and Ms. Blanco began keeping track of co-workers' time, other employees complained to Mr. Ramirez and other supervisors that Ms. Sullivan and Ms. Blanco's activities created a hostile work environment. One employee allegedly transferred because of it. Although the record indicates that Ms. Sullivan and Ms. Blanco's co-workers knew the two were keeping time records, both Ms. Sullivan and Ms. Blanco deny knowing that the other was doing so.

As a result of rising tension, Ms. Blanco's supervisor, Doug Cunningham, spoke with Ms. Blanco about co-worker relations. In January of 2000, Ms. Blanco, Mr. Ramirez and Doug Cunningham met, and Mr. Ramirez told Ms. Blanco that she should not be keeping other employees' time. Despite this meeting, Ms. Blanco continued tracking other employees' time.

On March 23, 2000, Ms. Sullivan took a message for Richard Cunningham from a friend. The message was: "big meeting, twelve noon tee off time at Long Bridge." R.45 ¶

227. The message was meant as a joke. Later that day, based on something overheard from Mr. Ramirez's secretary, Ms. Sullivan noted "Golf P.C." for Mr. Ramirez and that he left before noon. *Id.*, Sullivan Dep. at 107. "P.C." referred to Panther Creek, a golf course.

On March 24, 2000, when Mr. Ramirez arrived at work, his secretary informed him that she had heard that Ms. Sullivan had called Panther Creek to see if Mr. Ramirez was playing golf there. Mr. Ramirez attempted to verify the source of this information but was not successful.[5] Around this time, Mr. Ramirez passed Ms. Sullivan and her supervisor, Ferega, who had just gone on break. Mr. Ramirez then confronted Ms. Sullivan, told her that she did not need to check up on him and that he would be "tak[ing] care of" her. *Id.*, Sullivan Dep. at 111. After this confrontation, Ms. Sullivan left work on sick time.

Mr. Ramirez then told someone to obtain Ms. Blanco and Ms. Sullivan's calendars. He received permission from the labor relations unit to keep Ms. Blanco's calendar as evidence and to send Ms. Blanco home. He also told Richard Cunningham that he had received direction from the IDOT labor relations unit to send Ms. Sullivan home, but Ms. Sullivan already had left sick.

Mr. Ramirez then called Ms. Blanco into his office, and she admitted that the calendar and notations were hers. Mr. Ramirez told her that she was suspended and would be fired, and he instructed her to leave with her belongings. After Ms. Blanco left his office, Mr. Ramirez again confronted her at her cubicle and directed someone to call security to escort her from the building.

---

[5] At her deposition, Ms. Sullivan denied calling Panther Creek. *See* R.45, Sullivan Dep. at 112.

A security officer escorted Ms. Blanco from the building approximately thirty minutes later. Because it was break time, there were fifty or sixty people in the lobby area through which Ms. Blanco was escorted carrying her belongings in bags. After she was sent home, other employees in the department allegedly told Doug Cunningham that Ms. Blanco's conduct had gone on too long and that the disciplinary action was long overdue.

Ms. Sullivan came to work on Monday, March 27, and was instructed to meet with Richard Cunningham and Mr. Ramirez. At the meeting, Mr. Ramirez also suspended Ms. Sullivan with pay. He told her to leave with her personal belongings. Later in the week, Ms. Sullivan received a letter from Mr. Ramirez instructing her to return to work on Monday, April 3. Charges against Ms. Sullivan for insubordination, misuse of state time and disrupting the work environment were later dropped.

Prior to Ms. Sullivan's return, Mr. Ramirez called Ms. Blanco and also instructed her to return to work. Ms. Blanco's paid suspension lasted one day and a half. After she returned, she met with Doug Cunningham and Mr. Ramirez, and Mr. Ramirez instructed her not to keep other employees' time. Ms. Blanco filed a written grievance in regard to her suspension. In August 2000, she received a written warning regarding her conduct. The grievance remains open.

## B. District Court Proceedings

The district court granted summary judgment to Mr. Ramirez on the state claims but denied summary judgment based on qualified immunity with respect to the First Amendment claims. Applying the framework set forth in *Connick v. Myers*, 461 U.S. 138 (1983), and *Pickering v. Board*

*of Education*, 391 U.S. 563 (1968), the court held that the record-keeping constituted speech, that the speech qualified as a matter of public concern and that the balancing required under *Pickering* presented a jury question. It also ruled that a question of fact existed as to whether Mr. Ramirez would have taken the same action in absence of Ms. Sullivan and Ms. Blanco's protected speech. Furthermore, the court determined that the law was clearly established by 2000 that retaliation against an employee for protected speech violated the First Amendment. Mr. Ramirez timely appealed the district court's denial of qualified immunity.

## II
## DISCUSSION

### A. Standard of Review

We review de novo the district court's denial of summary judgment on the ground of qualified immunity. *See Knox v. Smith*, 342 F.3d 651, 656 (7th Cir. 2003). "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact that must be decided by a jury." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-55 (1986)). All facts must be construed and all inferences drawn in the light most favorable to the nonmoving party. *See Anderson*, 477 U.S. at 255.

### B. Qualified Immunity

Qualified immunity is a privilege that provides " 'an *immunity from suit* rather than a mere defense to liability.' " *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quoting *Mitchell*

*v. Forsyth*, 472 U.S. 511, 526 (1985)). The defense "is designed to protect government agents 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Knox*, 342 F.3d at 657 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Analysis of a qualified immunity defense requires a twofold inquiry. First, we must determine whether, taking the facts in the light most favorable to the plaintiffs, the official violated a constitutional right. *See Saucier*, 533 U.S. at 201. Second, we must inquire whether the right was clearly established in light of the specific context of the case. *See id.*

Ms. Sullivan and Ms. Blanco argue that this court should not address many of Mr. Ramirez's arguments regarding their First Amendment claim because those arguments are not properly before this court on an appeal from the denial of qualified immunity. The Supreme Court clarified in *Saucier*, however, that the initial inquiry into whether the facts alleged constitute a violation of a constitutional right is part of the qualified immunity analysis. The Court explained that one reason for such inquiry is to foster "the law's elaboration from case to case." *Saucier*, 533 U.S. at 201. Because this initial inquiry is an essential part of the qualified immunity analysis, Ms. Sullivan and Ms. Blanco's ability to establish the elements of their First Amendment claim is properly before this court.[6]

## C. First Amendment Claim

---

[6] Even prior to *Saucier v. Katz*, 533 U.S. 194 (2001), this court had stated that analysis of the elements of a First Amendment claim "is appropriate for a qualified immunity interlocutory appeal under *Behrens v. Pelletier*, 516 U.S. 299 (1996)." *Coady v. Steil*, 187 F.3d 727, 731 n.3 (7th Cir. 1999). Thus, it is clear that the elements of Ms. Sullivan and Ms. Blanco's First Amendment claim are properly before this court for consideration at this time.

A public employee retains First Amendment rights to free speech. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 970 (7th Cir. 2001). At the same time, a public employee does not possess unlimited rights of expression on matters related to official responsibilities. *See Vargas-Harrison*, 272 F.3d at 971. The government also has a recognized need to conduct its affairs effectively and efficiently. *See id.*; *see also Pickering*, 391 U.S. at 568.

A § 1983 claim for retaliation in violation of First Amendment rights in the public employment context involves a three-step analysis. First, the court must determine whether the employee's speech was constitutionally protected under the *Connick-Pickering* test. Second, the plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action. Third, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech. *See Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002); *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999); *see also Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002) (describing First Amendment retaliation claim as involving four elements but the same analysis); *Vargas-Harrison*, 272 F.3d at 970 (noting only the first two elements).

To determine whether speech is constitutionally protected, we engage in a familiar two-part inquiry traditionally known as the *Connick-Pickering* test. *See Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999); *see also Connick v. Myers*, 461 U.S. 138 (1983); *Pickering*, 391 U.S. at 563. Under *Connick*, we must determine whether the speech addressed a matter of public concern. If the speech did involve such a concern, under the *Pickering* balancing test, we then must determine whether the government's interest as an employer in

providing effective and efficient services outweighs the employee's interest as a citizen in commenting upon the matter of public concern. *See Coady*, 187 F.3d at 731. The determination of whether the speech is constitutionally protected is a question of law for the court. *See Kokkinis*, 185 F.3d at 843.

### 1. Speech as a Matter of Public Concern

Mr. Ramirez contends, as an initial matter, that no "speech" occurred. He submits that Ms. Sullivan and Ms. Blanco's notations on the privately kept calendars do not constitute "speech." As the district court noted, it is without question that "speech" includes writings publicly disclosed. *See Gonzalez v. City of Chicago*, 239 F.3d 939, 941-42 (7th Cir. 2001) (considering written reports "speech"); *Campbell v. Towse*, 99 F.3d 820, 826-30 (7th Cir. 1996) (considering memorandum "speech"). Whether "speech" includes writings involuntarily disclosed is a closer question.

Mr. Ramirez notes that little authority exists to establish that private notes involuntarily exposed constitute "speech." The Fifth Circuit has assumed, without deciding, that such notes constitute "speech." *See Terrell v. Univ. of Texas Sys. Police*, 792 F.2d 1360, 1362 (5th Cir. 1986). In *Terrell*, a university police officer kept private notes criticizing his supervisor. *Id.* at 1361. Photocopies of these notes were anonymously given to the supervisor, and the officer was soon fired. *Id.* The court declined to decide whether "an employee's personal notebook or diary can be considered first amendment 'speech' " when "the contents come to light completely without the employee's knowledge or consent," but it did evaluate the officer's claim. *Id.* at 1362. At least two district courts also have entertained First Amendment

retaliation claims on the basis of involuntarily disclosed writings. In *Verri v. Nanna*, 972 F. Supp. 773 (S.D.N.Y. 1997), a police officer's diary was involuntarily transferred to the chief of police, who retained the diary for some time. *Id.* at 782. The officer then brought suit for retaliation on First Amendment grounds, among other claims, asserting that the chief placed deficiency notes in his file based on the content of the diary. *Id.* at 783. In addressing the diary entries, the court cited *Terrell* on the matter of "speech" and continued in the analysis to consider whether the content warranted constitutional protection. *Id.* at 785. Similarly, in *Connor v. Clinton County Prison*, 963 F. Supp. 442 (M.D. Pa. 1997), the district court held that "speech" did occur after a supervisor found and read an employee's private log because the contents were then communicated, even though involuntarily. *Id.* at 446.

We believe that Ms. Sullivan and Ms. Blanco's private notations in their calendars constituted "speech." The record indicates that the content of Ms. Sullivan and Ms. Blanco's notations was known to the office community. Other employees complained to the supervisors about it. Mr. Ramirez confiscated the calendars before meeting with Ms. Sullivan or Ms. Blanco, which indicates that he already was aware of their content. Furthermore, Mr. Ramirez did in fact review the calendars. Given the specific facts of this case, we conclude that the content of Ms. Sullivan and Ms. Blanco's private notes was communicated and that "speech" occurred.[7]

---

[7] The 1999 letter which led to the police investigation is clearly "speech" for purposes of First Amendment analysis. Neither Ms. Sullivan nor Ms. Blanco claim responsibility for that letter, however; thus it cannot form the basis of their claim.

"Whether a government employee's speech addresses a matter of public concern depends upon 'the content, form, and context of [the speech] as revealed by the whole record.'" *Gustafson*, 290 F.3d at 906-07 (quoting *Connick*, 461 U.S. at 147-48). Content is the most important factor. *See id.* at 907. The "public concern" element must relate to a community concern and is not satisfied by "merely a personal grievance of interest only to the employee." *Id.* Therefore, to determine whether Ms. Sullivan and Ms. Blanco's speech addressed a matter of public concern, we must apply the content, form and context criteria, as set forth in *Connick*, mindful that a personal grievance of interest only to the employee does not qualify as a matter of public concern.

The content of Ms. Sullivan and Ms. Blanco's speech consisted of notations related to the comings and goings of their co-workers. The notes contained initials or names of certain employees, corresponding departure or arrival times and some notes regarding their whereabouts or reasons for absence. Complaints about personnel matters generally do not address a matter of public concern. *See Wallscetti v. Fox*, 258 F.3d 662, 667 (7th Cir. 2001); *see also Connick*, 461 U.S. at 148 (determining that speech regarding confidence in supervisors, office morale and the need for a grievance committee were outgrowths of a personnel dispute and did not address a matter of public concern). However, complaints containing documentation of time abuse have been held to address a matter of a public concern. *See Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219-20 (7th Cir. 1994) (holding that the district court properly found as a matter of law that the plaintiff was speaking on matters of public concern when she documented a co-worker's abuse of county time, abuse of county funds and failures to conduct required building inspections and communicated those documented concerns to a supervising board); *Breuer v. Hart*, 909 F.2d 1035, 1038

(7th Cir. 1990) (holding that allegations of favoritism, stolen property and receipt of pay for work not performed, communicated to state prosecutorial authorities, constituted matters of public concern); *Ohse v. Hughes*, 816 F.2d 1144, 1150-51 (7th Cir. 1987) (holding that allegations of alcohol consumption during business hours, the falsifying of mileage charges, the inappropriate taking of sick and vacation days, the misappropriation of public funds and the act of sleeping on the job, communicated to judges, county board members and the state's attorney's office constituted matters of public concern), *vacated and remanded*, 485 U.S. 902, *reinstated in relevant part*, 863 F.2d 22 (7th Cir. 1988). Chronic time abuse by public employees implicates the misuse of taxpayer funds. The content factor therefore weighs in favor of a determination that the speech addressed a matter of public concern.

As to form, the speech consisted of notes made in state-provided calendars privately kept. Those notes were not published voluntarily by Ms. Sullivan or Ms. Blanco and only were read by others after Mr. Ramirez confiscated the calendars. Those cases involving involuntarily communicated speech have held such a factor to weigh against a determination that the speech involved a matter of public concern. *See Terrell*, 792 F.2d at 1362-63 ("[The plaintiff] made no effort to communicate the contents of the notebook to the public, and the evidence does not suggest that he would have had any occasion to do so."); *Verri*, 972 F. Supp. at 786 ("By writing in his diary, [the plaintiff] did not intend to speak on a matter of public concern; he desired and expected no audience."); *Connor*, 963 F. Supp. at 450 ("The form is a log which was not voluntarily disclosed, so that no communication can be said to have been made until its discovery."). Yet, as we have noted earlier, the plaintiffs made known the existence of these "private" notes. Their existence was, simply put, a prop for additional discourse.

The third consideration under *Connick* is the context in which the speech arose. Ms. Sullivan and Ms. Blanco testified that they kept the notes to protect themselves. Largely on this basis, Mr. Ramirez argues that the notes merely concerned a personnel matter and that they are not entitled to constitutional protection as a matter of public concern. The motive of Ms. Sullivan and Ms. Blanco is a relevant, but not dispositive, factor in considering whether their speech addresses a matter of public concern. *See Marshall*, 32 F.3d at 1219; *see also Gustafson*, 290 F.3d at 908 ("[W]hile speech that is only motivated by private concerns may not be protected, '[a] personal aspect contained within the motive of the speaker does not necessarily remove the speech from the scope of public concern.' " (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000) (quoting *Marshall*, 32 F.3d at 1219))).

However, Ms. Sullivan and Ms. Blanco testified to an additional reason for keeping track of co-workers' time: the possibility of a future investigation into time abuse. In considering context, "it is necessary to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light?" *Kokkinis*, 185 F.3d at 844 (internal quotations and citations omitted). Ms. Sullivan and Ms. Blanco made their notations in the aftermath of an investigation by the Illinois State Police of possible time abuse in the Bureau. Both Ms. Sullivan and Ms. Blanco testified that they kept the notations as evidence for any future investigations of time abuse, and Ms. Blanco testified that the police told her information on time abuse was only valuable if supported by documentation. Abuse of time by government workers constitutes wrongdoing. *See Marshall*, 32 F.3d at 1219-20 (noting that co-worker's partisan activities at work, excessive mileage reimbursement requests and failures to perform building inspections "were the type that result in the misuse of public funds and trust"). Given these circum-

stances, it may be said fairly that the point of Ms. Sullivan and Ms. Blanco's speech was, in significant part, to bring wrongdoing to light.

Considering, as a whole, the content, form and context of Ms. Sullivan and Ms. Blanco's speech, there is sufficient reason to conclude that the speech addresses a matter of public concern.

### 2. *Pickering* Balancing

Even though Ms. Sullivan and Ms. Blanco's speech qualifies as a matter of public concern under *Connick*, their speech interest still must be balanced against their employer's interest under *Pickering* for the final determination of whether their speech warrants constitutional protection. *See Pickering*, 391 U.S. at 568. Ms. Sullivan and Ms. Blanco's speech interests do not prevail under this balancing test.

In examining this issue, the district court stated that the *Pickering* balancing presented a jury question. *Pickering* balancing, however, is a matter of law. *See Coady*, 187 F.3d at 731 n.3. The district court therefore erred when it failed to make a determination as to whether, on the facts alleged, Ms. Sullivan and Ms. Blanco's speech was constitutionally protected under *Pickering*.

Several factors, among others, are helpful in a *Pickering* analysis. Those factors include:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the un-

derlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Greer*, 212 F.3d at 371. Among these factors, however, the importance of the context in which the speech takes place is always entitled to significant weight. Recognizing that importance, we believe that Ms. Sullivan and Ms. Blanco's speech was not constitutionally protected.

We first examine the effect of the speech on workplace discipline and harmony. Neither Ms. Sullivan nor Ms. Blanco had any responsibility to keep time for other employees. The timekeeping directly contravened Mr. Ramirez's express instructions at the section meetings before the April 1999 police investigation. Mr. Ramirez also personally directed Ms. Blanco to stop tracking other employees' time because of problems with co-worker relations. Although both Ms. Sullivan and Ms. Blanco explain that they made their notations on their own time, their observations of co-workers' arrivals and departures were made throughout the work day. The record contains additional evidence of the disruptiveness of Ms. Sullivan and Ms. Blanco's speech. Employees complained to Mr. Ramirez and other supervisors about Ms. Sullivan and Ms. Blanco's note-keeping. One employee allegedly transferred because of it. The record indicates that employees believed the note-keeping was harmful to workplace morale. We conclude, from these circumstances, that Ms. Sullivan and Ms. Blanco's timekeeping created problems in maintaining discipline and co-worker harmony.

Additionally, a government employer may consider "the potential disruptiveness" of the speech. *Kokkinis*, 185 F.3d at 845 (internal citations and quotations omitted). We have

recognized previously that "[a] government employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" *Greer*, 212 F.3d at 372 (quoting *Connick*, 461 U.S. at 152). Similarly, "'[t]he public employer is not required to wait until those working relationships actually disintegrate if immediate action might prevent such disintegration.'" *Kokkinis*, 185 F.3d at 845 (quoting *Breuer v. Hart*, 909 F.2d 1035, 1040 (7th Cir. 1990)). We believe evidence of potential disruption also exists here. Ms. Sullivan and Ms. Blanco were not privy to other employees' work schedules or requests for leave. They merely tracked work behavior they found aberrant without any knowledge as to whether that behavior was consistent with the individual employee's time requirements or leave requests. Such activity certainly has the potential to cause co-worker distrust and the deterioration of working relationships. *See Kokkinis*, 185 F.3d at 845-46 (holding that evidence on the record as to workplace disharmony, disruption and deteriorating co-worker relations, which resulted from the plaintiff's TV appearance criticizing the police department and the chief's policies "amply support[ed]" a *Pickering* balancing in favor of the employer's interest in an efficient workplace); *see also Greer*, 212 F.3d at 372 (upholding *Pickering* balancing in favor of the employer given the potential for speech to "disrupt the operation of the Department by degrading the Department's standing with the public, undermining [the chief's] authority and inciting disharmony within Department ranks"); *cf. Gustafson*, 290 F.3d at 911 (holding that mere assertion of a generalized potential for disruption was insufficient to support *Pickering* balancing in the employer's favor).

We previously have noted that "the manner and means of the employee's protestation are key considerations in balancing the employer's and employee's interests under

*Pickering.*" *Greer*, 212 F.3d at 371. Although Ms. Sullivan and Ms. Blanco kept the notes to themselves, secreting them in their purse, bag, case or desk, and made their notations away from the office, the record also indicates that both made no secret of their monitoring activity. This evidence weighs against the free speech interests of Ms. Sullivan and Ms. Blanco.

Finally, we consider the context in which the speech arose. *See Kokkinis*, 185 F.3d at 846. Ms. Sullivan and Ms. Blanco's speech occurred in the wake of an investigation into an anonymous letter alleging time abuse which was found to be unsubstantiated. One employee indicated that this was a "difficult time" for the Bureau given the state police investigation. R.45, D. Cunningham Dep. at 40. Given the tension created by the prior, unsubstantiated and anonymous allegation of time abuse, we believe that the Bureau had a substantial interest in promoting workplace harmony.

Our consideration of workplace disruption within the Bureau, the manner and means of Ms. Sullivan and Ms. Blanco's speech and the context in which that speech arose leads us to conclude that the state's interest as an employer in promoting the efficient performance of public services outweighed Ms. Sullivan and Ms. Blanco's interests as citizens in speaking on the issue of possible time abuse in the Bureau in the manner they chose. Specifically, Mr. Ramirez's interest in terminating a cause of workplace conflict outweighed Ms. Sullivan and Ms. Blanco's interest in monitoring their co-workers' time by noting their arrivals and departures.

Nothing we say here is intended, of course, to suggest that state government employees are not protected by the First Amendment (and often by state statute) when they report illegalities in the workplace to appropriate authority. Such

activity must be undertaken, however, in a manner that does not disrupt legitimate management efforts to maintain an office's focus on its mission. Here, the office in question had established a uniform system of timekeeping, and the head of the office had directed that other employees were not to supplement—or supplant— this official record-keeping. Nevertheless, the plaintiffs took it on themselves not only to keep such extensive records but to make it clear to other employees that they were keeping such records in order to enforce their own views on appropriate management practice. It is this gratuitous assumption of an unofficial managerial role—despite the decision of management that such activity would be disruptive—that renders their action beyond constitutional protection.

Having concluded that Ms. Sullivan and Ms. Blanco's claim does not survive the *Pickering* balancing test, we need not consider whether speech was a substantial or motivating factor in a retaliatory action or whether the action would have been taken absent the speech. *See Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (setting out the elements of a First Amendment public employment retaliation claim). Neither must we consider whether the law was clearly established under the second prong of the qualified immunity analysis because we conclude that the facts as alleged do not establish a First Amendment violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

## Conclusion

Mr. Ramirez is entitled to qualified immunity on Ms. Sullivan and Ms. Blanco's First Amendment claims under 42 U.S.C. § 1983. As a matter of law, Ms. Sullivan and

Ms. Blanco's note-keeping is not constitutionally protected speech under the *Pickering* balancing test. For this reason, the judgment of the district court is reversed.

REVERSED

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*