In the

# United States Court of Appeals
### For the Seventh Circuit

No. 01-3814

ROSE NIEVES,

*Plaintiff-Appellant,*

*v.*

BOARD OF EDUCATION OF THE CITY OF CHICAGO,
and SHARON R. BENDER, in her individual capacity,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 1741—**Wayne R. Andersen,** *Judge.*

ARGUED MAY 16, 2002—DECIDED JULY 30, 2002

Before EASTERBROOK, ROVNER, and DIANE P. WOOD,
*Circuit Judges.*

ROVNER, *Circuit Judge.* Rose Nieves worked for the Chicago Board of Education (the "Board") from June 1984 until June 1998, with her last position being that of Security Supervisor II at Schurz High School. In June 1998, she received a letter from Sharon Rae Bender, the principal at Schurz, indicating that her position had been closed, and in July 1998 received a letter from Paul Vallas, then-CEO of the Chicago Public Schools, confirming that she was laid off as part of a reduction in force (RIF). Nieves was unable to obtain another position in the Chicago Pub-

lic Schools until August 2000. She filed suit against her principal, Bender, and the Board, alleging that she was terminated because she exercised her constitutional right to free speech, in violation of § 1983 and state law.

During the relevant time period, Bender was principal of Schurz High School and Nieves was employed as a Security Supervisor II. Nieves acknowledges receiving a memorandum from Bender to all employees whose positions were funded through state Chapter I funds, informing them that some of their positions might be closed as a result of a decrease in Chapter I funding at Schurz. In December 1997, Bender received confirmation that Schurz' state Chapter I funding would indeed be reduced by approximately $278,000 for the next year. During this time period, Schurz was on academic probation because a high percentage of its students had tested below grade level in reading. Accordingly, the budget at Schurz was no longer controlled by the local school council, but instead all budget decisions had to be approved by a probation manager, who emphasized that the top priority at the school had to be an improvement of reading scores. Bender therefore decided that she needed to hire a reading teacher for the next year, and because that teacher had to be paid through Chapter I funds, that decision further strained that funding source. Bender decided to eliminate five Chapter I-funded positions and did so on the first available date to include the position closings in the lump sum budget, which was February 17, 1998. Nieves later received the June letter from Bender and the July letter from Vallas indicating that her position was closed and that she was laid off as part of an RIF. The five Chapter I-funded positions closed were: Security Supervisor II, teacher assistant, teacher, guidance counselor aide, and school security aide. The aide positions were vacant at the time of the decision, and the employees in the teacher and teacher assistant positions obtained other jobs at Schurz.

Nieves testified that after her position was closed, she was aware that other positions for which she was qualified were available at Schurz, but she did not apply for any of those positions. Nieves did not obtain another position in the Chicago schools until August 2000, when she was hired as a guidance counselor aide at Prosser High School. Bender hired a new reading teacher in 1998 and the reading scores improved such that Schurz was taken off academic probation in 1999.

Those facts are undisputed by the parties. Other facts, however, forming the basis of the complaint, are contested. Nieves contends that her termination was not a response to the Chapter I funding problems, but was actually in retaliation for an incident that occurred in January 1998 regarding the provision of bilingual tutoring services to Hispanic and Polish students.

Nieves states that in January 1998 she stopped two students of Polish descent in the hallway to ask where they were going. They declared that they were going to Room 138 for English language tutoring. Previously, Nieves had been informed that Room 138 was to be kept locked and that tutoring would not take place there. Nieves then stated to them that the Hispanic students were told that they had to come before or after school or on weekends for tutoring. She also contacted her supervisor and complained that Polish students were receiving tutoring opportunities unavailable to Hispanic students. The next day, she was called into a meeting with Bender, in which Bender expressed her anger over the incident. Bender concluded the meeting by suggesting that Nieves apply for an administrative transfer to another school and stated that she would sign such a transfer request. Bender later sent a note to Nieves, reiterating that Nieves' statements were lies and offering an administrative transfer.

Bender acknowledges that the incident occurred, although she asserts that she confronted Nieves because Nieves used

an inappropriate term, "Pollacks" to refer to the students of Polish descent, and because Nieves was creating problems in the school by erroneously declaring that Hispanic students were not provided equal opportunities, saying in front of students that the Polish students get all the special treatment. She also stated that she offered the administrative transfer because a person from the Safety and Security department who visited the school a few months before the incident had expressed surprise that Nieves still worked there and had told Bender that Nieves wanted an administrative transfer to another school. Nieves did not introduce any evidence rebutting that testimony. Regarding the speech incident in general, however, there is a factual dispute concerning what transpired and whether the speech was truthful or false and inflammatory. That dispute cannot be resolved on summary judgment. Therefore, for purposes of this appeal from summary judgment, we assume that in January 1998 Nieves was engaged in speech regarding a matter of public concern that is protected under the First Amendment.[1]

Bender responds that the termination decision was based on the Chapter I funding problem and on the needs of the school. In support of her position, she states that in November 1997—before the protected speech occurred—she contacted Curtis Goodman, a Board employee who worked in the Bureau of Employee and Labor Relations, and asked him for the job descriptions for a couple of positions, including Security Supervisor II. She further asked him whether she could close the Security Supervisor II position and a teacher aide position without having a grievance. Goodman allegedly informed her that the position

---

[1] Nieves also points to speech that occurred in March 1998 regarding gambling at the school, but that speech occurred after the termination decision had been made and adds nothing to the claim because we assume that the January speech was protected.

of Security Supervisor II was obsolete in that it was no longer being used in the schools and no one else currently held that position. He also allegedly informed her that she could close those positions because they were Chapter I-funded positions. Bender testified to those conversations in her deposition apparently to show her state of mind in December 1997 when she was evaluating her options in light of the Chapter I funding deficit. In support of her testimony, she included in the record a faxed note from Goodman in November 1997 to Bender stating "FYI" and attaching a copy of a phone message. That message was from someone in Safety and Security, and states that regarding the position at Schurz, a "234 position" (which means a Chapter I position) opened by the principal may be closed by the principal. That faxed note substantiates Bender's statement that she discussed closing the Chapter I-funded security position months before the protected speech. Nieves offered no evidence to rebut that allegation, such as a statement by Goodman disputing the subject of their conversation.

In order to establish a claim under the First Amendment, Nieves has the burden of establishing that her conduct was constitutionally protected, and that the protected conduct was a "substantial" or "motivating" factor in the decision to terminate her. *Mt. Healthy City School District Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Pugh v. City of Attica, Indiana*, 259 F.3d 619, 629-30 (7th Cir. 2001); *Gooden v. Neal*, 17 F.3d 925, 928 (7th Cir. 1994). If she carries that burden, then the defendants would have the opportunity to establish that they would have reached the same decision even in the absence of the protected conduct. *Id.* We assume for the purpose of this summary judgment motion that Nieves has demonstrated that she engaged in speech that was constitutionally protected. The only question for summary judgment purposes is whether she established a genuine issue of material fact on the

question of causation—specifically whether she alleged sufficient facts that her speech was a substantial or motivating factor in the decision to close her position. In order to avoid summary judgment, Nieves cannot merely rest on the pleadings, but must move beyond those pleadings and present positive evidence to support her position, such as through affidavits, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Moreover, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Essentially, in support of the causation element, Nieves offers only (1) her unsupported allegation that the decision was made after the protected speech and (2) the timing of the termination, occurring approximately one month after the protected speech. Neither of these is sufficient to survive summary judgment on causation. Nieves' mere allegation that the decision was made after her protected speech is insufficient to create a genuine issue of fact because it is not based on personal knowledge and has no other support in the record. She relies for that opinion not on any record evidence, but rather on the absence of minutes or other notes establishing that the decision was made earlier. The absence of such minutes, however, are not helpful because Nieves introduced no evidence that such minutes are generally kept regarding such decisions, and in fact the testimony in the record from Bender was that personnel decisions are private and would never appear in minutes. Nieves also does not point to any minutes or other notes maintained after the protected speech indicating that the decision was made at that later time.

Accordingly, Nieves seeks to draw an inference that is simply without any support in the record, and her mere allegation is insufficient because she lacks personal knowledge as to when the decision was made.

We note that this is not the type of situation in which no other means were available to determine when the decision was made. Nieves never sought to obtain deposition testimony or written statements from other persons who would have been involved in the decision, and who therefore could have cast light on when the decision was made. For instance, she never sought to take the deposition or statement from Curtis Goodman, with whom Bender alleged she spoke in December concerning the duties of Security Supervisor II and the ability to cut that position. Moreover, Nieves did not attempt to take the deposition of other members of the Finance Committee, or of the probation manager, who would also have been part of the decision-making process.

Instead, Nieves relies primarily on the timing of the decision, arguing that she received notification of the decision one month after the protected speech. Timing alone will rarely be sufficient to create a triable issue of fact. *Pugh*, 259 F.3d at 630 ("[t]he timing of the action, without more, is insufficient to establish the protected activity as a motivating factor."). In this case, Nieves has presented no other evidence to connect the timing of the decision to her protected expression. Nieves was not fired for cause, but rather her position was eliminated as part of an RIF that also eliminated four other positions at the school. Although the two other persons affected received other positions at the school, Nieves testified that she did not apply for the open positions at Schurz even though she was qualified for some of them and she knew that she had to apply to obtain them. The RIF was conducted in response to the loss of Chapter I funds and the need to use available Chapter I funds to hire a reading

teacher in order to address the reading problems that had placed the school on academic probation. Nieves does not contest that Chapter I funding was significantly reduced, and that prior to her protected expression Bender informed employees in all Chapter I positions that their position might be eliminated as a result of the funding cut. Finally, Nieves did not rebut the evidence that the position of Security Supervisor II was obsolete, and that it was not held by any other person in the Chicago public schools. Nieves, in short, failed to offer any refutation of the evidence that the decision to close her position, and four other positions, was made in December when the Chapter I funding cut became certain. Her failure to challenge those factual assertions renders largely irrelevant any allegations that Bender wanted her to leave after the speech incident. Because Nieves presented no other evidence to establish causation, the court properly granted summary judgment in favor of the defendants. Accordingly, the decision of the district court is AFFIRMED.

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
