# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2480

NANCY SPIEGLA,

*Plaintiff-Appellant,*

v.

MAJOR EDDIE HULL, Individually as an Employee
of Westville Correctional Facility; HERB NEWKIRK,
Individually as Superintendent of Westville
Correctional Facility; and BERNARD JOHNSON,
Individually as an Employee of Westville
Correctional Facility,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for
the Northern District of Indiana, Hammond Division.
No. 01 CV 0075—**Allen Sharp**, *Judge.*

_____

ARGUED JANUARY 14, 2004—DECIDED JUNE 14, 2004

_____

Before FLAUM, *Chief Judge*, and POSNER and DIANE P.
WOOD, *Circuit Judges.*

FLAUM, *Chief Judge.* Correctional officer Nancy Spiegla's
shift schedule and post assignment were changed four days
after she had a conversation with the Assistant Superinten-
dent of Westville Correctional Facility ("Westville" or "the
facility") in which she questioned a new vehicle search

policy and reported the suspicious behavior of two Westville employees. In response to her schedule change and transfer, Spiegla filed a 42 U.S.C. § 1983 suit against Major Eddie Hull, Herb Newkirk, and Bernard Johnson ("the Defendants"), officials and employees of Westville, alleging that they unlawfully retaliated against her for exercising her First Amendment rights. At the time relevant to the complaint, Newkirk was the Superintendent, Johnson was the Assistant Superintendent of Operations, and Hull was Major of Westville. The district court granted the Defendants' motion for summary judgment on the bases that Spiegla's speech was not constitutionally protected and that she was not reassigned because of her speech. Spiegla now appeals the district court's ruling. For the reasons stated herein, we reverse the judgment of the district court and remand the case for proceedings consistent with this opinion.

## I.  Background

In 1985, Spiegla began her employment as a correctional officer at Westville, a state prison in Westville, Indiana. Between 1993 and 1999, Spiegla was transferred back and forth between posts on the front and back gates of the facility and was responsible for searching persons and vehicles entering the prison. During her years on gate duty, Spiegla developed expertise in conducting vehicle searches, particularly ones of large trucks. Spiegla's competency as a gate officer is undisputed. Defendant Newkirk even presented her with Westville's "Correctional Officer of the Year" award just a few months before the transfer at issue in this case occurred.

On Thursday, January 13, 2000, Spiegla was working on the front gate under the direction of Sergeant Brian Moody. While on duty, Spiegla observed Defendant Hull and Captain Ernest Huff, while in a state-owned vehicle, enter

the staff and visitors' parking lot located on the outside of the facility and near the front gate. According to Spiegla, the two men removed bags from their private vehicles, placed the bags into the state-owned vehicle, and then drove towards the front gate. Based on these observations, Spiegla told Moody that she intended to search the state-owned vehicle. Moody instructed Spiegla not to conduct the search and informed her of a new exemption policy for searches of state-owned vehicles. Whereas under the previous policy all incoming vehicles were searched for contraband, the new policy exempted state-owned vehicles from being searched.

Apparently, this was not the first time that Hull and Huff attracted the attention of gate security. Moody had previously witnessed the two men drive their vehicle into the staff and visitors' parking lot while they were conducting "perimeter checks" (a security check that entails driving around the facility to inspect the fence). Moreover, on several recent occasions, Moody had attempted to search vehicles occupied by Hull and Huff and on each occasion they refused to consent to search before entering the facility.[1]

Spielga explained in her deposition that after Moody told her about the new policy, "I duly noted it in my log because I was very upset over it because everybody has to go through the shakedown procedure . . . ." When asked to clarify her feelings, she responded, "I was just upset because I could not go out there and do my job." Spiegla said

---

[1] We accept the position throughout this opinion that Hull and Huff's behavior was highly suspicious and consistent with contraband trafficking. For the purposes of this case, we are only concerned with the suspicious appearance of their conduct. We readily acknowledge that there is no indication that these two individuals actually were engaged in smuggling contraband and no charges were ever brought against them.

that she was not angry, but "[j]ust, you know, frustrated type of thing. You know, just like, You got to be kidding? That type of attitude."

Later that day, Spiegla discussed Hull and Huff's conduct and the new search policy with the Assistant Superintendent of Westville, John Schrader. Specifically, Spielga asked him when the search orders changed and whether he was aware that state vehicles were not to be searched. Schrader responded that all vehicles were to be "shaken down" and then he asked her why she asked. Spiegla then told Schrader about her observations of Hull and Huff and Moody's instruction not to "shake them down." Schrader agreed that the two men should have been "shook down" and assured Spiegla that he would bring the matter to the attention of Superintendent Newkirk.

Either later that day or the following day, Schrader recounted his conversation with Spiegla at an executive staff meeting attended by Schrader, Johnson, Hull, and Newkirk. Johnson acknowledges that he was "pretty pissed" that Spiegla's concerns were raised at the meeting. Though Johnson did not express his feelings at the meeting, he was "mad at Spielga" because she did not follow her chain of command.

The following Monday, January 17, 2000, four days after her conversation with Schrader, Spiegla learned that she was being transferred[2] from the front gate. That morning, Captain Hugh Vales called Spiegla at the front gate and asked her what she had done wrong. When she responded that she did not know what he was talking about, Captain Vales informed her that she had been transferred and that

_____

[2] The Defendants contend that Spiegla was not transferred, but rather reassigned, as she continued to remain a correctional officer. We recognize that Westville may make a technical distinction between the two terms, but we will use "transfer" for simplicity's sake.

her shift schedule had been changed from five days on and two days off ("5-2") to the less desirable six days on and two days off ("6-2"). Thereafter, Spiegla was assigned to various non-gate perimeter postings that differed on a day-to-day basis. At these postings, Spiegla had no opportunity to use her vehicle searching expertise. Moreover, these were mobility-intensive postings that were painful for Spiegla to perform because of an osteoarthritic condition. As a result of the physical hardships she faced at the perimeter posts, Spiegla applied for the position of Teacher's Assistant IV in April 2000. In accepting this position, Spiegla suffered a 4½% reduction in pay. The following month, Spiegla's pay was further reduced.

The record does not reveal who precisely effectuated Spiegla's January 2000 transfer to a non-gate post. Though none of the Defendants have admitted to effectuating the transfer, all of them possessed authority to do so. However, all the Defendants acknowledge involvement in the decision effectuating Speigla's change in shift.

In December 2001, Spiegla filed suit against the Defendants under § 1983, alleging a deprivation of her rights secured by the First and Fourteenth Amendments to the United States Constitution. After the close of discovery, the Defendants filed a motion for summary judgment. The district court granted the Defendants' motion determining that the speech at issue was not addressed to a matter of public concern and that Spiegla did not suffer an adverse action as a result of her speech. Spiegla appeals that decision, as well as the district court's denial of her motion to compel the production of documents.

## II. Discussion

A.  First Amendment Claim

We review *de novo* the district court's grant of summary judgment. *See Dunn v. City of Elgin*, 347 F.3d

641, 645 (7th Cir. 2003). A grant of summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact "exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Puckett v. Soo Line Ry. Co.*, 897 F.2d 1423, 1425 (7th Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). On appellate review, we review the facts and inferences in the light most favorable to the nonmoving party. *See Haefling v. UPS*, 169 F.3d 494, 497 (7th Cir. 1999). Summary judgment is inappropriate when alternate inferences can be drawn from the available evidence. *See Hines v. British Steel Corp.*, 907 F.2d 726, 728 (7th Cir. 1990).

In evaluating a § 1983 claim for retaliation in violation of First Amendment rights in the public employment context, we apply a three-step analysis premised on the Supreme Court's decision in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). First, we must determine whether the employee's speech was constitutionally protected. Second, the plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action. Third, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech. *See Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004); *Vukadinovich v. Bd. of Sch. Trs.*, 278 F.3d 693, 699 (7th Cir. 2002); *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999).

### 1. Protected Speech

Public employees are entitled to free speech rights under the First Amendment. *See Pickering v. Bd. of Educ.*, 391

U.S. 563, 568 (1968). At the same time, the government must have the ability to run efficiently as an employer. *See Sullivan*, 360 F.3d at 697. To balance these interests, the Supreme Court has held that the government may not punish the speech of a public employee if it involves matters of public concern unless the state can prove that the needs of the government outweigh the speech rights of the employee. This principle forms the basis of the two-part inquiry known as the *Connick-Pickering* test that courts use to determine whether speech is constitutionally protected. *Id.*

### a.   Matter of Public Concern

First, under the *Connick* prong, we must decide whether Spiegla spoke as a citizen on a matter of public concern by considering the "content, form, and context of [the contested] statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Of these three factors, the content of the speech is considered to be the most important. *See Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002). Speech that serves a private or personal interest, as opposed to a community one, does not satisfy the standards for First Amendment protection. *Id.* Therefore, to determine whether Spiegla's speech addressed a matter of public concern, "we must apply the content, form, and context criteria, as set forth in *Connick*, mindful that a personal grievance of interest only to the employee does not qualify as a matter of public concern." *Sullivan*, 360 F.3d at 699.

The speech at issue in this case consists of Spiegla's statements to Assistant Superintendent Schrader regarding (1) the state-owned vehicle search exemption policy and (2)

the behavior of Hull and Huff.[3] Without doubt, issues of prison security, public safety, and official corruption are matters of concern to the community, particularly to one hosting a correctional facility. An inmate in possession of a weapon can pose a threat to prison employees, other inmates, and the surrounding community itself. Here, the concern is not merely hypothetical, as numerous articles were featured in the *South Bend Tribune* and *Indianapolis Star* detailing the serious problems at Westville concerning contraband trafficking and official corruption. *See, e.g.,* Editorial, *Prison extortion claim demands close examination,* South Bend Tribune, August 14, 2000, at A7; Matthew S. Galbraith, *Three investigators suspended at Westville,* South Bend Tribune, May 27, 1998, at B1; James A. Gillaspy, *Drug probe in prisons now focus on employees,* Indianapolis Star, July 11, 1993, at 1; Matthew S. Galbraith, *The Living Hell of Westville,* South Bend Tribune, October 31, 1993, at A5. While not dispositive of whether speech relates to a matter of public concern, the fact that the press takes interest in the matter is relevant to the determination. *See Gustafson,* 290 F.3d at 907.

On the other hand, simply because speech relates to prisons does not automatically render it a matter of public concern. *See, e.g., Button v. Kibby-Brown,* 146 F.3d 526 (1998) (prison employee's complaints regarding his supervisor's refusal to return donated educational materials not a matter of public concern). Speech by a government employee relating to ordinary matters of internal operation and lacking connection to "any matter of political, social, or other concern to the community" is not entitled to First

---

[3] Spiegla contends that she was also retaliated against for the statements she made to Sergeant Moody. However, there is no evidence in the record to suggest that any of the Defendants actually knew of her conversation with Moody. Accordingly, we will focus our analysis on Spiegla's conversation with Schrader.

Amendment protection. *Connick*, 461 U.S. 146. *Connick* itself involved an assistant district attorney's objections to various policies and conditions in her office. The Supreme Court determined that her complaints relating to intra-office transfer policies, office morale, and grievance proce-dures were "internal office affairs" and thereby not entitled to First Amendment protection. *Id.* at 149. Clearly, complaints of this sort relating to prison operations would receive similar treatment. As we observed in *Kuchenreuther v. City of Milwaukee*:

> While speech addressing matters of police protec-tion and public safety are matters of public concern, we have cautioned that if every facet of internal operations within a governmental agency were of public concern, and therefore any employee complaint or comment upon such matters constitutionally protected, no escape from judicial oversight of every governmental activity down to the smallest minutia would be possible.

221 F.3d 967, 974-975 (7th Cir. 2000) (internal quotations and citations omitted).

However, the speech in this case is readily distinguish-able from complaints concerning ordinary office policy and can even be separated out from comments addressing prison security and public safety matters in general. Not only did Spiegla bring critical attention to a policy that had the potential to compromise prison security, she reported the suspicious conduct of two of her superiors who appeared to be using that very policy to facilitate unlawful behavior. Indiana considers the trafficking of contraband with a prison inmate to be a Class A misdemeanor; and a felony if a controlled substance or deadly weapon is involved. IND. CODE ANN. § 35-44-3-9 (West 2004). Clearly, the smuggling of contraband, if proven, would constitute "wrongdoing or breach of public trust," which the Court in *Connick* sug-gested might qualify speech for protection. 461 U.S. at 148.

Unscrupulous public employees may find ways to exploit the resources and opportunities available to them through their offices. Perhaps the public's best protection against these few wayward individuals is the insider who is willing to speak up and shed light on her colleagues' improprieties. Recognizing the "whistleblower's" important role, our cases have consistently held that speech alleging government corruption and malfeasance is of public concern in its substance. *See Sullivan*, 360 F.3d at 699 (notations of chronic time abuse by co-workers matters of public concern); *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219-20 (7th Cir. 1994) (allegations that co-worker abused county time and funds and violated the state law matters of public concern); *Breuer v. Hart*, 909 F.2d 1035, 1038 (7th Cir. 1990) (complaints that defendant stole county property of public concern in their content); *Ohse v. Hughes*, 816 F.2d 1144, 1151 (7th Cir. 1987) (allegations of inappropriate taking of sick and vacation days and misappropriation of public funds matters of public concern); *see also Eberhardt v. O'Malley*, 17 F.3d 1023, 1027 (7th Cir. 1994) (remarking that "[t]he courts have had to separate the not very socially valuable forms of speech from whistle-blowing and other socially valuable expressive activities of public employees," in determining whether contested speech addresses a matter of public concern).

Thus, Spiegla's disclosure of potential malfeasance on the part of Hull and Huff positions her speech, with respect to its content, comfortably on the socially valuable side of the constitutional line. We emphasize that Spiegla's report was not based on rumor or mere hunch. Nor was she tattling on trivial office indiscretions. Rather, Spiegla's speech addressed her direct observations of prison officials engaged in activity consistent with contraband trafficking, a serious violation of state law, at a facility with a history of problems with contraband.

A different case would be presented if Spiegla's questions about the search policy had not been followed by her disclosure of Hull and Huff's suspicious conduct. There must be a communicative element to speech that puts the listener on alert that a matter of public concern is being raised. Simply seeking clarification on the state of the search policy would likely have been too disconnected from the contraband problem to have raised a matter of public concern. However, when Spiegla's questions about the policy are considered in conjunction with her allegations of malfeasance, it becomes apparent that, in substance, she spoke on a matter of public concern.

The form of Spiegla's speech similarly supports a conclusion that she spoke on a matter of public concern. Spiegla spoke voluntarily with Schrader and initiated the conversation herself. Although it occurred in private, she did not intend that the conversation would be kept confidential. The fact that Spielga "communicated privately with [her] superior[ ] does not make [her] speech less a matter of public concern." *Delgado v. Jones*, 282 F.3d 511, 518 (7th Cir. 2002) (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979) (extending First Amendment protection to private as well as public expression)). Indeed, an employee who attempts to follow internal mechanisms to resolve important issues should not automatically be treated less favorably than the individual who immediately turns to the press or public forum. In this case, Schrader assured Spielga that he would convey her concerns to Newkirk, thereby serving as the conduit through which Spiegla publicized her concerns to the individual with the power to rectify the problems that she perceived.[4]

---

[4] Spiegla eventually took her concerns public. *See Corrections officer blames prison staff for contraband*, South Bend Tribune, November 26, 2000, at D2.

Next we consider the context in which the speech arose. At this stage we will consider Spiegla's motive for speaking as a relevant, though not dispositive, factor in determining whether her speech addressed a matter of public concern. *Sullivan*, 360 F.3d at 700. "Motive matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee." *Gustafson*, 290 F.3d at 908 (internal quotations and citations omitted). *But see Breuer*, 909 F.2d at 1038-39 (explaining that a "finding that a speaker was motivated by narrow self-interest . . . alone cannot disqualify a speaker from protection. Wrongdoing may often be revealed to the proper authorities only by those who have some personal stake in exposing wrongdoing."). In considering the context of speech, "it is necessary to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light?" *Kokkinis*, 185 F.3d at 844 (internal quotations omitted). The fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove it from the scope of public concern. *Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 410 (7th Cir. 1994). The critical determination is whether the individual was speaking "more like a citizen or a disgruntled employee whose statements are primarily of personal interest." *Colburn v. Trustees of Ind. Univ.*, 973 F.2d 581, 585 (7th Cir. 1992).

The Defendants contend that Spiegla's speech represented a wholly personal grievance. In support of their position, the Defendants rely on a statement from Spiegla's deposition where she explained that she was upset about the new search policy because it would make it "more difficult to do my job." Accepting the Defendants' position and finding that Spiegla's speech involved merely personal matters, the district court concluded that, "[Spiegla] voiced her concern over the new policy because she was upset due to the fact that she felt she was not able to do her job." Dist. Ct. Op. at 7.

Although the language she uses in her deposition is ambiguous, Spiegla's testimony indeed supports the conclusion that she was motivated, in part, by a self-interest when she spoke with Schrader. Whether her frustration with the new policy arose from her lost authority to conduct searches, confusion about gate procedures, or simple disagreement with the decision to alter the search routine, it seems evident that Spiegla had at least some personal stake in speaking with Schrader. However, we disagree with the district court's ruling that Spiegla's motivations were exclusively self-interested. Rather, the more compelling interpretation is that Spiegla's frustration with the new policy primarily arose from her belief that it would make keeping contraband out of the prison more difficult. As a veteran employee, Spiegla was familiar with the serious contraband trafficking and corruption problems plaguing Westville.[5] We accept Spiegla's claim that she understood her "job" in terms broader than the simple execution of vehicle searches. Indeed, keeping contraband out of the prison was a "job" that became more "difficult" under the new search policy (as more vehicles would now enter without inspection), while the physical execution of guard duties in fact became easier (as fewer vehicles would need to be searched). That Spiegla spoke in direct response to observing Hull and Huff's suspicious behavior further supports the notion that she had a public motivation. If the goal of her discussion with Schrader was simply to gather information regarding post orders, she might not have made a point of reporting the behavior of Hull and Huff. Against this backdrop, we cannot conclude that Spiegla's motivations for reporting the potentially unlawful conduct of

---

[5] Contrary to the Defendants' contention, it is not necessary for Spiegla to have personally witnessed an incident of smuggling for her to know that there was a contraband problem at the facility.

superiors to a high-level prison official were confined to advancing primarily personal objectives.

Furthermore, the district court was misplaced in its reliance on our decision in *Gonzalez v. City of Chicago*, 239 F.3d 939 (7th Cir. 2001) (determining that statements made in a report were not protected speech because report writing was part of the employee's required duties). We explicitly stated in *Delgado v. Jones* that "our holding in *Gonzalez* is limited to the routine discharge of assigned functions, where there is no suggestion of public motivation." 282 F.3d at 519. In *Delgado*, the Court determined that a police detective's memorandum containing information potentially damaging to his superiors was protected speech. *Id.* at 520. The Court emphasized that in contrast to the speech at issue in *Gonzalez*, Delgado's disclosures "went far beyond some rote, routine discharge of an assigned duty" and he had "considerable discretion about how he communicated the information up the chain of command." *Id.* at 519. Similarly, Spiegla departed from the routine performance of her assigned duties when she raised questions about the search policy and the conduct of Hull and Huff. Spiegla's job function was to implement prison security policies, not to question those policies or to report the suspicious activities of her colleagues. The Defendants contend that a failure to communicate her concerns would have been a dereliction of Spiegla's duty (a surprising position considering that the Defendants also argue that the speech in question was nothing more than an informational inquiry). As we said of a similar argument raised in *Delgado*, "this argument . . . sweeps much too broadly." *Id.* While Spiegla's actions may have been consistent with her general duty as a correctional officer to keep the facility secure, they were not part and parcel of her core functions. Indeed, Spiegla exercised discretionary choice when she decided to go outside her chain of command and disclose her observations to Schrader.

By focusing on the presence of a personal motivation and the fact that Spiegla raised her concerns within the scope of her employment, the district court improperly elevated motivation to a litmus test and thereby undervalued the important content of Spiegla's speech. *See Cliff*, 42 F.3d at 410 (indicating that motive cannot become a litmus test supplanting content in terms of overall importance). We emphasize that the specificity and seriousness of the allegations against Hull and Huff are essential to our refusal to categorize Spiegla's speech as a personal dispute. If we were to decide otherwise, public employees would be chilled from reporting their similar suspicions of government corruption and impropriety. Such a result would be contrary to sound public policy. In sum, viewing the record as a whole, the content, form, and context of Spiegla's speech lead us to the conclusion that she acted beyond her employment capacity and spoke as a private citizen on a matter of public concern when she brought the search policy and Hull and Huff's conduct to the attention of her superior.

### b. Balancing of Interests

After determining that Spiegla's speech addressed a matter of public concern, we would ordinarily move to the *Pickering* analysis and balance her interest as a citizen in commenting on the matter against the state's interest, as employer, in promoting effective and efficient public service. *See Pickering*, 391 U.S. at 568; *Waters v. Churchill*, 511 U.S. 661, 675 (1994). However, the Defendants did not make *Pickering*-based arguments in their motion for summary judgment or in their reply brief on appeal. Additionally, they contend that we need not address balancing as the district court did not grant summary judgment on that basis. While it is true that the district court did not engage in a *Pickering* analysis, the Defendants' position is some-

what complicated by a sentence in the district court's order reading in relevant part that "[t]he failure to satisfy either prong of the *Connick-Pickering* test renders Spiegla's section 1983 claim meritless . . . ." Dist. Ct. Op. at 8-9. Assuming that the district court held in the alternative (as opposed to misstating its holding), we conclude that summary judgment was inappropriate on a *Pickering* basis given that the issue was not presented in the Defendants' motion for summary judgment and that the district court was silent on the basic underlying facts or legal reasoning that supported its determination. *See Schiller v. Moore*, 30 F.3d 1281, 1284 (3d Cir. 1994) (finding summary judgment inappropriate on the basis of the *Pickering* test where district court's opinion was silent as to reasoning it employed and parties had not made strong showing as to their relative interests); *see also Roe v. City of San Diego*, 356 F.3d 1108, 1122 (9th Cir. 2004) (remanding case for further proceedings where district court did not reach *Pickering* balancing phase). We note that as *Pickering* is a question of law, it will be the responsibility of the district court to balance the parties' interests as revealed by the record on the appropriate motion.

### c.    Qualified Immunity

In their motion before the district court, the Defendants argued that they were entitled to summary judgment on the basis of qualified immunity. The defense of qualified immunity "is designed to protect government agents 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). However, because the *Pickering* analysis is essential to the determination of whether a constitutional violation occurred in this case, we

cannot now reach the issue of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (holding that before determining whether a right was clearly established, courts must first determine whether, taking the facts in the light most favorable to the plaintiff, the official violated a constitutional right); *see also Sullivan*, 360 F.3d at 697.

## 2. Causation

Before discussing whether the evidence supports a causal link between Spiegla's speech and her transfer and schedule change, we will briefly address the Defendants' contention that Spiegla did not suffer a sufficiently adverse employment action. The Defendants argue that Spiegla suffered no harm since she had agreed in writing to be available for assignment to any shift and that all of her assignments fell under the broad category of "perimeter duty" (a duty involving a variety of posts including gate security, escorting prisoners between complexes, and "towers.") However, a § 1983 case does not require an adverse employment action within the meaning of the antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964. *See Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). Rather, "*[a]ny* deprivation . . . that is likely to deter the exercise of free speech . . . is actionable." *Id.* (citing *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982) (explaining that minor harassment, including making fun of an employee for bringing a birthday cake to the office, may be sufficient to deter the exercise of First Amendment rights)). Certainly, we cannot hold as a matter of law that transfer to a more physically demanding and less skilled post and an unfavorable change in schedule—even though such actions may

have been permissible under the terms of her employment—are insufficient to deter the exercise of free speech.[6]

Turning to the motivating factor issue, Spiegla must establish a causal link between the contested speech and her transfer and schedule change. *See Mt. Healthy*, 429 U.S. at 287. That is, she must establish by a preponderance of the evidence that a motivating factor in the Defendants' action was retaliation. *See Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir. 1988) (en banc). "This [C]ourt has stated that, in order to carry his or her [motivating factor] burden, the plaintiff must show 'had it not been for the violation, the injury of which [s]he complains would not have occurred . . . .'" *Id.* (citing *Button v. Harden*, 814 F.2d 382, 383 (7th Cir. 1987)); *see also Galdikas v. Fagan*, 342 F.3d 684, 696 (7th Cir. 2003); *Abrams v. Walker*, 307 F.3d 650, 654 (7th Cir. 2002); *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1368 (7th Cir. 1993). As pointed out recently in *Johnson v. Kingston*, 292 F.Supp. 2d 1146, 1155-56 (W.D. Wis. 2003), this requirement creates an anomaly with the next step of the *Mt. Healthy* burden-shifting analysis, which provides that once the plaintiff has made her showing, the burden shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same actions regardless of the plaintiff's protected conduct. *See Mt. Healthy*, 429 U.S. at 287; *see also Galdikas*, 342 F.3d at 696 (if plaintiff meets burden of showing that challenged action

---

[6] We do, however, reject Spiegla's contention that the pay cut she received after being assigned to the position of Teacher Assistant IV is evidence of an adverse action. Although Spiegla may have felt "forced" to apply for the position, the fact of the matter is that the application was voluntary and no evidence suggests that any of the Defendants compelled her to apply. Furthermore, the additional reduction in pay Spiegla received after working in the Teacher Assistant IV position for a month is too remote from her speech to support a causal link.

would not have occurred "but for" the constitutionally protected conduct, "the burden shifts to the defendant, who must show by a preponderance of the evidence that he would have taken the same actions even in the absence of the protected conduct."). Logically, if the plaintiff shows by a preponderance of the evidence that had it not been for the protected activity her injury would not have occurred, it would not be possible for the defendant to then prove by a preponderance of the evidence that the injury would have occurred regardless of the protected activity. This approach requires the plaintiff to carry so much of the burden that nothing remains to shift to the defendant to prove.

Therefore, we disavow the requirement that a plaintiff alleging First Amendment retaliation has the burden of proving but-for causation as recited in the following cases: *Galdikas*, 342 F.3d at 696; *Abrams*, 307 F.3d at 654; *Love v. City of Chicago Bd. of Educ.*, 241 F.3d 564, 569 (7th Cir. 2001); *Thomsen v. Romeis*, 198 F.3d 1022, 1027 (7th Cir. 2000); *Johnson v. Univ. of Wis.-Eau-Claire*, 70 F.3d 469, 482 (7th Cir. 1995); *O'Connor*, 985 F.2d at 1368; *Rakovich*, 850 F.2d at 1190; *Button*, 814 F.2d at 383.[7] The relevant burden language used in these cases is inconsistent with the majority of Seventh Circuit cases discussing First Amendment retaliation claims[8] and contrary to the rule

---

[7] This opinion has been circulated among all judges of this Court in regular and active service in accordance with Seventh Circuit Rule 40(e). No judge favored a rehearing en banc on the question of whether to retract any suggestion in earlier decisions that the plaintiff in a First Amendment retaliation case must establish but-for causation.

[8] Indeed, the majority of Seventh Circuit cases discussing First Amendment retaliation claims do not characterize the motivating factor requirement as a but-for test. *See, e.g.*, *Smith v. Dunn*, No. 03-2777, 2004 WL 1049131, at *3 (7th Cir. May 11, 2004); *McGreal v. Ostrov*, No. 02-3405, 2004 WL 1041520, at *10 (7th

(continued...)

applied in the other eleven regional circuits.[9] Accordingly,

---

[8] (...continued)
Cir. May 10, 2004); *Williams v. Seniff*, 342 F.3d 774, 782 (7th Cir. 2003); *Nieves v. Bd. of Educ.*, 297 F.3d 690, 693 (7th Cir. 2002); *Vukadinovich v. Bd. of Sch. Trs.*, 278 F.3d 693, 699 (7th Cir. 2002); *Horwitz v. Bd. of Educ.*, 260 F.3d 602, 618 (7th Cir. 2001); *Pugh v. City of Attica*, 259 F.3d 619, 630 (7th Cir. 2001); *Klunk v. County of Joseph*, 170 F.3d 772, 775 (7th Cir. 1999); *Gooden v. Neal*, 17 F.3d 925, 928 (7th Cir. 1994); *Fleming v. County of Kane*, 898 F.2d 553, 558 (7th Cir. 1990); *Conner v. Reinhard*, 847 F.2d 384, 393 (7th Cir. 1988); *McClure v. Cywinski*, 686 F.2d 541, 545 (7th Cir. 1982).

[9] No other circuit requires plaintiffs to show but-for causation in order to satisfy their burden. *See Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 n.11 (1st Cir. 2003) (explaining that First Amendment plaintiff's burden of proving motivation under *Mt. Healthy* test is more substantial than the burden of producing prima facie evidence in a Title VII case, but not requiring plaintiff to show but-for causation); *Coogan v. Smyers*, 134 F.3d 479, 484 (2d Cir. 1998) (substantial or motivating factor burden not defined as a but-for test); *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 795 (3d Cir. 2000) ("Where a reasonable inference can be drawn that an employee's speech was at least one factor considered by an employer in deciding whether to take action against the employee, the question of whether the speech was a motivating factor in that determination is best left to the jury."); *Wagner v. Wheeler*, 13 F.3d 86, 90-91 (4th Cir. 1993) (not requiring plaintiff to show but-for causation); *Brady v. Fort Bend County*, 145 F.3d 691, 710-11 (5th Cir. 1998) (burden shifts if plaintiff proves that her speech activities were a substantial consideration that influenced defendant's decision not to rehire); *Sowards v. Loudon County*, 203 F.3d 426, 433-35 (6th Cir. 2000) (requiring but-for causation to be shown by the defendant, but not the plaintiff); *Taylor v. Cochran*, 830 F.2d 900, 903 (8th Cir. 1987) (same); *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2003) (same); *Copp v. Unified Sch. Dist.*, 882 F.2d 1547, 1553-54 (10th Cir. 1989) (same); *Leonard v. Columbus*, 705 F.2d 1299, 1303-04 (11th Cir. 1983) (same); *Clark*
(continued...)

we follow the approach delineated in the majority of our cases, adopted in our sister circuits, and compelled by *Mt. Healthy* itself, i.e., a plaintiff alleging First Amendment retaliation must prove by a preponderance of the evidence that his or her protected activity was a motivating factor in the defendant's retaliatory action. To clarify, a motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions. As we said in *Klunk v. County of St. Joseph*, "[i]f the speech addresses a matter of public concern, the employee must show that the protected speech caused, or at least played a substantial part in, the employer's decision" to take adverse employment action against the plaintiff. 170 F.3d 772, 775 (7th Cir. 1999). Once the plaintiff proves that an improper purpose was a motivating factor, the burden shifts to the defendant, as mandated by *Mt. Healthy*, to prove by a preponderance of the evidence that the same actions would have occurred in the absence of the protected conduct.

In this case, Spiegla readily satisfies her burden. She has demonstrated by a preponderance of the evidence that her comments to Schrader were a substantial or motivating factor in her transfer and shift change. "It is settled in this Circuit that, 'a plaintiff may establish . . . a causal link between protected expression and adverse action through evidence that the [adverse action] took place on the heels of

---

[9] (...continued)
*v. Library of Congress*, 750 F.2d 89, 101 n.25 (D.C. Cir. 1984) (plaintiff only need to show substantial factor, not only factor). *But see Ezekwo v. NYC Health & Hosp. Corp.*, 940 F.2d 775, 780 (2d Cir. 1991) (standalone Second Circuit case requiring plaintiff to "establish . . . that the speech played a substantial part in the employer's adverse employment action; i.e., that the adverse action would not have occurred *but for* the employee's protected actions.").

protected activity.'" *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (quoting *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994)).[10] Not only did just four days (including the weekend) elapse between Spiegla's conversation with Schrader and her transfer and schedule change, it came after seven years of uninterrupted postings on the prison gates. *See Collins v. Illinois*, 830 F.2d 692, 704-05 (7th Cir. 1987) (plaintiff's uninterrupted two-year tenure shows causal connection). Moreover, Johnson admitted that he was "pretty pissed" that Spiegla's comments were raised at the executive staff meeting and he said that he was "mad at Ms. Spiegla." Taken together, the closely related sequence of events, Spielga's long and uninterrupted tenure, and Johnson's anger with Spiegla demonstrate that Spiegla's speech was a motivating factor in the decisions to transfer her and to change her shift.

Moreover, we are unpersuaded by the Defendants' contentions that they would have taken the same action in absence of Spiegla's protected speech. The Defendants argue that Spiegla's removal from the front gates resulted from normal variance in officers' post assignments. This argument is undermined by Spiegla's seven years of continuous assignments to gate posts. As for the shift change, the Defendants point to evidence in the record showing that in 2000 a number of positions were converted from (5-2) schedules to (6-2) schedules to reduce the amount of overtime the facility paid. While it is undisputed that these conversions occurred, the record does not compel a conclusion that Spiegla's schedule change was part of this reorganization. A document produced by the Defendants entitled, "TRANSFERS EFFECTIVE MAY 21, 2000" lists

---

[10] *Adusumilli* and *Dey* are Title VII cases, but, in this Circuit "the causation analysis for a § 1983 retaliation claim tracks the causation analysis for a Title VII retaliation claim." *Johnson v. Univ. of Wis.-Eau-Claire*, 70 F.3d 469, 482 (7th Cir. 1995).

the names of sixteen employees who were indeed transferred from (5-2) groups. However, as is made apparent by the document's title, these transfers took place over four months after Spiegla's schedule had been switched. As the Defendants have not presented evidence identifying any other individual who underwent a shift conversion around the same time that Spiegla did, we cannot conclude by a preponderance of the evidence that she was not subjected to isolated treatment.

### B. Motion to Compel

Lastly, we consider Spiegla's claim that the district court improperly denied her motion to compel the production of documents. We conclude there is no basis to overturn the district court's decision. Trial courts have broad discretion over discovery matters and we review a district court's pretrial discovery rulings for an abuse of discretion. *Rennie v. Dalton*, 3 F.3d 1100, 1110 (7th Cir. 1993). Spiegla's argument that the district court's decision should be reversed is premised on her discovery of relevant documents through other channels (her union) that the Defendants should have had copies of but did not turn over. However, obtaining unproduced documents, by itself, does not demonstrate that the district court abused its discretion in denying motions to compel or that it erroneously limited discovery.

### III. Conclusion

The judgment of the lower court is REVERSED and we REMAND the case for proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*